JUANITA MAY JACOBY, petitioner,

*v.*

ANTHONY JACOBY, defendant.

[Decided February 9th, 1928.]

*Mr. William I. Garrison,* for the petitioner.

*Mr. William Elmer Brown, Jr.,* for the defendant.

INGERSOLL, V. C., orally.

This is the most astounding case that has ever been before me. We start out with a premise in the very beginning that I am bound to find that the petitioner and her mother are endeavoring to deceive the court as to the time of the marriage. The fact that they have failed, without explanation, to produce their marriage certificate, the fact that although from November, 1926, they must have been informed by the pleading in this case, that the defendant insists that he was married in 1925, they took no steps to prove otherwise.

Now, the rule of law is clear that if a person can produce something which will testify in their favor or be proof in their favor—when they fail to do it that the presumption is that it would be against their testimony. There cannot be any doubt in my mind, from the testimony that is produced, that the petitioner and her mother have willfully—I will perhaps qualify that a little and limit the present statement to the petitioner—endeavored to deceive this court. I cannot help but believe that the mother also knew the true date of this marriage.

Now, if that is true, all of their testimony must be received and considered by the court with a good deal of anxious consideration. If, in view of the notice given, they still persist in making a statement, which, under the circumstances, I must believe is erroneous, their entire testimony must bear the taint of the apparent willful deceit. It is perfectly natural that if this marriage occurred in 1925, and that the child was born so shortly thereafter—I repeat it is perfectly natural for the young woman and for her mother and for her husband to attempt to deceive the world and show that the child was the result of relations during marriage—but that natural inclination cannot go·so far as to justify falsehoods upon the witness-stand under oath. There is the situation so far as their testimony is concerned.

It is also astounding for a mother to expect a son-in-law and a daughter of the apparent normal condition of these young people, and of their age and constitution, to expect that a normal happy marriage should result, with the husband not having an opportunity and access to the bed of the wife, and he certainly could not have the access to her bed while she slept with the mother. Of course, by access I do not mean·that they were prevented entirely from the marriage relations, but the natural relations could not exist.

The situations on the other side are just as susceptible to wonderment. Can it be believed that a young man living separate and apart from his wife, and a young woman living separate and apart from her husband, both of whom have knowledge that the wife of the husband is objecting to their apparent friendship—I repeat, can it be believed that the couple's relations are truly platonic under all the circumstances of the case?

One of the most astounding features in this entire case is the actions of Mr. and Mrs. Cressman, who, knowing that there is at least some question as to the relations between Jacoby and their sister, both of whom are living apart from their spouses, take Jacoby as a boarder in their apartment. They have a bedroom, which is separated from the rest of the house by doors in a doorway of that room. They put Jacoby

on a davenport in a room which has nothing but a curtain between that room and the bedroom of the sister, and it is to be noted that the bed, as the davenport becomes a bed when drawn out, extends to the curtain, practically in the same room. They are in a secluded room—the husband and wife are in a secluded room—but this young man and this young girl, whose relations are at least being discussed, are put out there practically in one room, with nothing but a curtain between—and the foot of the davenport with no bootboard, practically reaching to the curtain. Whether illicit relations occurred or not, I am not now prepared to say, but could a brother-in-law and a sister put greater temptation between a couple than was done in this case—two young normal people, living separate and apart from their spouses? It is almost inconceivable that a couple would place such temptation before young people of this sort. Now, it may be that the testimony will show that their relations were so thoroughly platonic, so thoroughly proper, that these matters were not even thought of. That, however, in the history of life we are all compelled to take notice of the fact does not usually exist.

I have not yet referred to what—to me—is the most astounding feature of the entire matter, now speaking more particularly as to the witness-stand, and that is this man Wisler. Without any authority at all, because he had no authority, he accompanies a constable, and he, Wisler, takes practically all of the activity, and I am convinced from the testimony of Mr. Reinberger that Mr. Wisler has deliberately committed perjury upon the witness-stand. I do not think there is any doubt about it. He says he found this couple under the covers with their arms around each other or "in his arms," words to that effect. I do not believe it. I do not believe he saw it, and I think that he deliberately misstates the fact when he says he did, Mr. Reinberger did not confirm it and every other party in the case testifies otherwise. I am satisfied that adultery did not occur upon the night of this raid. If it did, I am bound to find Mr. and Mrs. Cressman so unworthy of the name of man and woman, if they would have a home of that sort and permit two couples to divide themselves up into illicit relations in that way under the circumstances, so un-

worthy to be considered, hardly civilized. Animals would hardly do a thing of that sort.

Therefore, the case comes to this: Is the testimony of the last witness sufficient to show desire on the part of this couple for illicit relations? I am very much inclined to believe that if it is, the incident of the arm around the girl would not be sufficient, and, if it did occur, the one kiss would not be sufficient to show, but there is room for consideration whether the entire actions of Jacoby—and how any man, of Mr. Jacoby's apparent standing, appearance and all, could deliberately leave his own home and go to the home of a woman whom he knows his wife at least fears as being in his affection and take up his residence in the manner in which I have described—does it or does it not smack of honesty, or is it an evidence of utter disregard?

The manner of the parties can be considered from two standpoints—was it openly a brazen act on his part to show to his wife that he was interested in this other woman and did not care who knew it, or was it a public, open act of a man who knew he was innocent and who did not think of the seriousness of the result of such things, and who felt that, as long as he was innocent of guilt, he had a right to do much as he pleased? Those are matters for consideration, gentlemen.

Now, so far as the main case is concerned, I have expressed to you my feelings and the points which are in question in my mind.

I do not think that the cross-petition is now subject to consideration. The time during the pendency of a *bona fide* suit for divorce cannot be considered as a part of the time of desertion. This woman brings a petition for divorce upon the ground of adultery. The petition is cetrainly *bona fide*. Certainly the time of the pendency of this suit cannot be taken as a part of the two years for desertion as charged in the cross-petition. Otherwise, no woman could, believing her husband guilty of adultery, withdraw herself from him and bring a suit for divorce without putting herself in the position, and during the entire time of that trial putting herself in the position of her bringing the petition, believing her husband

guilty of adultery, and leave herself open to divorce. That I will, if necessary, file a memorandum on, but I simply give you that now, my views on this matter.

Now, I have amplified this proposition much more than I usually do, perhaps much more than ordinarily proper, but this case is so filled with apparent unreasonable things, apparent extraordinary features, that I feel that you should know the position the court finds itself in at the present time.

As I have stated in other cases, this does not in any way say to you that my mind is fixed or set upon any point, I will be very glad to hear you, but I simply give you my view to save arguing points upon which either of you may have agreed with me upon.

THIS MEMORANDUM IS CONCLUDED AFTER HEARING ARGUMENT.

While the conduct of all parties was so unusual and the opposite of that which makes for a happy married life, I am convinced that adultery was not committed upon the night of the raid, and while the defendant and the co-respondent probably had opportunity to commit the crime, I am very loath to find that they actually did so. If we exclude the fact of their living in the same house (upon which I have already commented), and the lack of probative force of the testimony of the petitioner and her mother (of which I have also commented), the only testimony concerning "desire" is that of Miss Duffield, who on direct testimony said upon one occasion she saw these parties sitting in an automobile "with his arm around her" (the witness declined to call it hugging), and on cross-examination said that on the same occasion she saw him kiss her.

The air surrounding this case, and the fact that the petitioner was willing to depend upon the testimony of the detective, which testimony is so clearly false, and could have been so demonstrated before the trial, the conduct of the petitioner and her mother during the period of the marriage, the manner and conduct of the several witnesses upon the stand, convince me that a decree for divorce should be refused.

The petition, as well as the cross-petition, will be dismissed.